James W. Perkins (JWP 6684)
Rachel Sims (RS 6924)
GREENBERG TRAURIG, LLP
200 Park Avenue
New York, New York 10166
Tel. No.: (212) 801-9200
Fax: (212) 801-6400
*Attorneys for Defendant*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------- X

MERCER CAPITAL, LTD.,

                        Plaintiff,

        - against -

U.S. DRY CLEANING CORPORATION,

                      Defendant.

-------------------------------------------------------------------- X

U.S. DRY CLEANING CORPORATION,

               Counter-Claim Plaintiff,

        - against -

MERCER CAPITAL, LTD.,

            Counter-Claim Defendant.

-------------------------------------------------------------------- X

Case No.: 08 CIV 5763 (LTS)

**ANSWER AND
COUNTERCLAIMS**

       Defendant U.S. Dry Cleaning Corporation ("Dry Cleaning"), by its attorneys, Greenberg

Traurig, LLP, answers the Complaint herein as follows:

<u>**SUBSTANCE OF THE ACTION**</u>

       1.      Answering paragraph 1, Dry Cleaning denies the allegations, as they do not allege

facts, but merely characterize the nature of the action.  The allegations of the Complaint speak

for themselves.

2.    Answering paragraph 2, Dry Cleaning admits that on or about September 1, 2007, it and Mercer Capital, Ltd. ("Mercer") signed an Engagement Agreement (the "Agreement"), admits that the terms of the Agreement provide for a non-accountable expense allowance equal to 2% of the gross proceeds raised by Mercer, but denies the remaining allegations as an inaccurate and incomplete characterization of the substance of the Agreement and refers to the contents thereof for the full understanding of the parties.

3.    Answering paragraph 3, Dry Cleaning denies the allegations.

4.    Answering paragraph 4, Dry Cleaning denies the allegations on the ground that they do not accurately set forth the terms and conditions of the Agreement and refers to the contents thereof for the full understanding of the parties.

5.    Answering paragraph 5, Dry Cleaning denies the allegations.

6.    Answering paragraph 6, Dry Cleaning denies the allegations.

7.    Answering paragraph 7, Dry Cleaning denies the allegations.

8.    Answering paragraph 8, Dry Cleaning denies the allegations.

9.    Answering paragraph 9, Dry Cleaning denies the allegations.

10.    Answering paragraph 10, Dry Cleaning denies the allegations on the ground that they do not accurately set forth the terms and conditions of the Agreement and refers to the contents thereof for the full understanding of the parties.

11.    Answering paragraph 11, Dry Cleaning denies the allegations on the ground that they do not accurately set forth the terms and conditions of the referenced document and refers to the contents of such document for the full understanding of the parties.

12.    Answering paragraph 12, Dry Cleaning lacks sufficient knowledge to admit or deny the allegations and, therefore, denies the allegations.

13.    Answering paragraph 13, Dry Cleaning denies this paragraph on the ground that the allegations do not call for an admission or denial.

## THE PARTIES

14.    Answering paragraph 14, Dry Cleaning lacks sufficient knowledge to admit or deny the allegations and, therefore, denies the allegations.

15.    Answering paragraph 15, Dry Cleaning lacks sufficient knowledge to admit or deny the allegations and, therefore, denies the allegations.

16.    Answering paragraph 16, Dry Cleaning admits that it is a Delaware Corporation, but denies the remaining allegations.

## JURISDICTION AND VENUE

17.    Answering paragraph 17, Dry Cleaning denies the allegations on the ground that they state legal conclusions for which no response is required.

18.    Answering paragraph 18, Dry Cleaning denies the allegations on the ground that they state legal conclusions for which no response is required.

19.    Answering paragraph 19, Dry Cleaning denies the allegations on the ground that they state legal conclusions for which no response is required.

## FACTUAL BACKGROUND

20.    Answering paragraph 20, Dry Cleaning admits that it signed the Agreement, but denies that the allegations accurately set forth the terms and conditions of the Agreement and refers to the contents thereof for the full understanding of the parties.

21.    Answering paragraph 21, Dry Cleaning denies the allegations on the grounds that they inaccurately set forth the terms and conditions of the Agreement and refers to the contents thereof for the full understanding of the parties, but admits that the terms of the Agreement

provide for a non-accountable expense allowance equal to 2% of the gross proceeds raised by Mercer.

22.    Answering paragraph 22, Dry Cleaning denies the allegations on the ground that they do not accurately set forth the terms and conditions of the Agreement and refers to the contents thereof for the full understanding of the parties.

23.    Answering paragraph 23, Dry Cleaning denies the allegations on the ground that they do not accurately set forth the terms and conditions of the Agreement and refers to the contents thereof for the full understanding of the parties.

24.    Answering paragraph 24, Dry Cleaning denies the allegations on the ground that they do not accurately set forth the terms and conditions of the Agreement and refers to the contents thereof for the full understanding of the parties.

25.    Answering paragraph 25, Dry Cleaning denies the allegations on the ground that they do not accurately set forth the terms and conditions of the referenced document and refers to its content for the full understanding of the parties.

26.    Answering paragraph 26, Dry Cleaning denies the allegations.

27.    Answering paragraph 27, Dry Cleaning denies the allegations.

28.    Answering paragraph 28, Dry Cleaning lacks sufficient knowledge to admit or deny the allegations and, therefore, denies the allegations.

29.    Answering paragraph 29, Dry Cleaning lacks sufficient knowledge to admit or deny the allegations and, therefore, denies the allegations.

30.    Answering paragraph 30, Dry Cleaning lacks sufficient knowledge to admit or deny the allegations and, therefore, denies the allegations.

31.    Answering paragraph 31, Dry Cleaning denies the allegations.

32.    Answering paragraph 32, Dry Cleaning denies the allegations.

33.    Answering paragraph 33, Dry Cleaning admits that it paid plaintiff in excess of $533,271, but denies the remaining allegations.

34.    Answering paragraph 34, Dry Cleaning denies the allegations on the ground that they do not accurately set forth the terms and conditions of the Agreement and refers to the Agreement for the full understanding of the parties.

35.    Answering paragraph 35, Dry Cleaning lacks sufficient knowledge to admit or deny the allegations of the first sentence and, therefore, denies such allegations and denies the remaining allegations.

36.    Answering paragraph 36, Dry Cleaning lacks sufficient knowledge to admit or deny whether "no warrants have been issued to Plaintiff" and denies that any alleged "demand" was due.

37.    Answering paragraph 37, Dry Cleaning denies the allegations on the ground that they do not accurately set forth the terms and conditions of the Agreement and refers to the contents thereof for the full understanding of the parties.

38.    Answering paragraph 38, Dry Cleaning denies the allegations.

39.    Answering paragraph 39, Dry Cleaning denies the allegations on the ground that they do not accurately set forth the terms and conditions of the Agreement and refers to the contents thereof for the full understanding of the parties.

40.    Answering paragraph 40, Dry Cleaning denies the allegations on the ground that they do not accurately set forth the terms and conditions of the referenced document and refers to the contents of such document for the full understanding of the parties.

41.    Answering paragraph 41, Dry Cleaning lacks sufficient knowledge to admit or deny the allegations of the first sentence and, therefore, denies such allegations and denies the remaining allegations.

## FIRST CAUSE OF ACTION
### (Breach Of Contract)

42.    Answering paragraph 42, Dry Cleaning incorporates by reference each of its answers to paragraphs 1 through 41 of the Complaint as if fully set forth herein.

43.    Answering paragraph 43, Dry Cleaning admits that it and Plaintiff signed the Agreement, but denies the remaining allegations as an inaccurate characterization of the substance of the Agreement and refers to the contents thereof for the full understanding of the parties.

44.    Answering paragraph 44, Dry Cleaning denies the allegations.

45.    Answering paragraph 45, Dry Cleaning denies the allegations.

46.    Answering paragraph 46, Dry Cleaning Dry Cleaning admits that it paid plaintiff in excess of $533,271, but denies the remaining allegations.

47.    Answering paragraph 47, Dry Cleaning lacks sufficient knowledge to admit or deny the allegations of the first sentence and, therefore, denies such allegations and denies the remaining allegations.

48.    Answering paragraph 48, Dry Cleaning denies the allegations.

49.    Answering paragraph 49, Dry Cleaning denies the allegations.

50.    Answering paragraph 50, Dry Cleaning denies the allegations.

51.    Answering paragraph 51, Dry Cleaning denies the allegations on the ground that they do not accurately set forth the terms and conditions of the Agreement and refers to the Agreement for the full understanding of the parties.

52.    Answering paragraph 52, Dry Cleaning denies the allegations on the ground that they do not accurately set forth the terms and conditions of the Agreement and refers to the Agreement for the full understanding of the parties.

53.    Answering paragraph 53, Dry Cleaning denies the allegations.

54.    Answering paragraph 54, Dry Cleaning lacks sufficient knowledge to admit or deny the allegations and, therefore, denies the allegations.

55.    Answering paragraph 55, Dry Cleaning denies the allegations.

## SECOND CAUSE OF ACTION
### (Unjust Enrichment)

56.    Answering paragraph 56, Dry Cleaning incorporates by reference each of its answers to paragraphs 1 through 55 of the Complaint as if fully set forth herein.

57.    Answering paragraph 57, Dry Cleaning denies the allegations.

58.    Answering paragraph 58, Dry Cleaning denies the allegations.

59.    Answering paragraph 59, Dry Cleaning denies the allegations.

60.    Answering paragraph 60, Dry Cleaning denies the allegations.

61.    Answering paragraph 61, Dry Cleaning denies the allegations

## THIRD CAUSE OF ACTION
### (Accounting)

62.    Answering paragraph 62, Dry Cleaning incorporates by reference each of its answers to paragraphs 1 through 61 of the Complaint as if fully set forth herein.

63.    Answering paragraph 63, Dry Cleaning denies the allegations on the ground that they do not accurately set forth the terms and conditions of the Agreement refers to the Agreement the full understanding of the parties.

64.    Answering paragraph 64, Dry Cleaning denies the allegations on the ground that they do not accurately set forth the terms and conditions of the Agreement refers to the Agreement the full understanding of the parties.

65.    Answering paragraph 64, Dry Cleaning denies the allegations.

### FIRST AFFIRMATIVE DEFENSE

66.    Plaintiff has failed to state a claim upon which relief can be granted.

### SECOND AFFIRMATIVE DEFENSE

67.    Plaintiff's claims, and each of them, are barred by the doctrine of unclean hands.

### THIRD AFFIRMATIVE DEFENSE

68.    Any injury or damage which may have been suffered by Plaintiff resulted wholly or in substantial part from the misconduct of the Plaintiff.

### FOURTH AFFIRMATIVE DEFENSE

69.    Plaintiff's claims, and each of them, are barred because of failure of consideration.

### FIFTH AFFIRMATIVE DEFENSE

70.    Plaintiff's claims, and each of them, are barred because Plaintiff received payment.

### SIXTH AFFIRMATIVE DEFENSE

71.    Plaintiff's claims, and each of them, are barred because Plaintiff failed to perform a condition precedent.

WHEREFORE, the claims of the Complaint should be dismissed in their entirety.

### COUNTERCLAIMS

Defendant/Counterclaim Plaintiff Dry Cleaning alleges for its counterclaims against Plaintiff/Counterclaim Defendant Mercer as follows:

## PARTIES AND JURISDICTION

72.    Dry Cleaning is a Delaware corporation and its principal executive offices are located at 4040 MacArthur Boulevard, Suite 305, Newport Beach, California 92660. Its Chief Executive Officer and founder is Robert Y. Lee ("Lee").

73.    Mercer alleges in the Complaint that it is a registered broker/dealer, and that it is a Texas partnership with its principal place of business located 40 Wall Street, 31st Floor, New York, New York.

74.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332. This Court has supplemental jurisdiction over the counterclaims alleged herein pursuant to 28 U.S.C. § 1367.

## BACKGROUND

75.    Formed in 2005, Dry Cleaning is an up and coming national chain of dry cleaning businesses. Dry Cleaning is a "small cap" company.

76.    In or about the Spring of 2007, in support of its goal to create the preeminent national chain in the dry cleaning industry, Dry Cleaning sought to raise capital through the offer and sale of its securities. In connection with this offering, Dry Cleaning sought to engage a placement agent to solicit and secure purchasers of the securities.

77.    In or around the Summer of 2007, Dry Cleaning interviewed numerous firms to act as placement agent for an offering of its securities. During this search process, Mercer solicited Dry Cleaning to act as placement agent for the anticipated securities offering.

**The Bait**

78.    In or about the Summer of 2007, and based on Mercer's solicitation of Dry Cleaning, Lee, on behalf of Dry Cleaning, had a number of meetings with Andrew Dorman ("Dorman") Anthony Salino ("Salino") and Gary Goldstein ("Goldstein") who held themselves

out to be, respectively, Director of Investment Banking of Mercer, its Chief Operating Officer/Principal, and head of institutional sales, to discuss the possibility of engaging Mercer to act as the placement agent for the offering of Dry Cleaning securities.

79.    During their initial meeting that was held on or about June 20-22, 2007, Dorman, Salino and Goldstein told Lee that Mercer was a well-connected expert in raising capital for small companies. They further told Lee that Mercer had recently concluded a successful offering for Neostem, Inc., by raising approximately $6 million in an approximately one-month period. Dorman, Salino and Goldstein further told Lee that, given Mercer's expertise and its capacity to handle larger offerings, Mercer could easily raise $100 million. They also told Lee that Dry Cleaning's stated objective of raising $20 million should be increased to $50 million, given Mercer's capabilities and Mercer's having tested the market for the Dry Cleaning offering of securities with a positive response. Lee responded that Dry Cleaning only had an interest in raising $20 million.

80.    In or about July and August 2007, to induce Lee to cause Dry Cleaning to engage Mercer as the placement agent, Dorman, Salino and Goldstein repeatedly assured Lee that Mercer itself would easily raise $10 million. In particular, Dorman, Salino and Goldstein represented to Lee and other Dry Cleaning representatives, by telephone and in person on numerous occasions, including at meetings of July 3, July 10-11, August 9 and August 29, 2007, that Mercer's institutional investment arm had committed to raising $5 million.

81.    Dorman, Salino and Goldstein further represented to Lee and other Dry Cleaning representatives during these meetings that they had assurances from Mercer's retail brokers that the brokers would raise an additional minimum of $5 million from sales to individual investors.

82.    Further to induce Lee to cause Dry Cleaning to enter in an agreement with Mercer, Dorman, Salino and Goldstein represented to Lee and other Dry Cleaning representatives that Mercer could easily raise additional monies through its connections with the syndicates of other brokerage firms. In particular, Dorman, Salino and Goldstein represented to Lee and other Dry Cleaning representatives, by telephone and on numerous occasions before signing the Engagement Agreement, including at meetings of July 3, July 10-11, August 9 and August 29, 2007, that Mercer had strong working relationships with syndicates of other brokerage firms such as National Securities, Newbridge Securities Corporation, J.P. Turner & Company, LLC, Joseph Stevens & Co., Inc., and numerous other firms and often placed securities through each of those firms. They further told Lee that these relationships would give strong support to Dry Cleaning securities in the market after the initial offering.

83.    Further to induce Dry Cleaning to enter into an agreement with Mercer, Dorman, Salino and Goldstein represented to Lee and other Dry Cleaning representatives, by telephone and in person on numerous occasions before signing the Engagement Agreement, including at meetings of July 3, July 10-11, August 9 and August 29, 2007, that if Lee engaged Mercer as placement agent, Mercer would make the Dry Cleaning engagement Mercer's sole focus. Dorman, Salino and Goldstein further represented to Lee that Mercer would not work on any other deals while raising money for Dry Cleaning.

84.    Relying upon the foregoing representations, and in particular, on Mercer's representations that it had significant relationships in the financial markets that would result in a fully subscribed offering, on or about September 1, 2007, Dry Cleaning signed an Engagement Agreement with Mercer to act as its placement agent in locating investors to purchase Dry Cleaning securities (the "Agreement").

85.     Pursuant to the Agreement, Mercer was appointed as the exclusive placement agent to offer and sell, to accredited investors, securities of Dry Cleaning.

86.     Pursuant to the Agreement, Mercer agreed to offer and sell to accredited investors a minimum of $2 million (defined in the Agreement as the "Minimum Offering") and a maximum of $20 million of senior secured convertible notes (as defined in the Agreement) of Dry Cleaning.

87.     The Agreement provided that Mercer's appointment as placement agent was to terminate upon the completion or termination of the Offering.

88.     Pursuant to Section 3 of the Agreement, Mercer agreed that it would be paid compensation based on a percentage of the gross proceeds raised by Mercer.

89.     Pursuant to Section 7 of the Agreement, Mercer's agency was subject to the condition that on the Initial Closing Date (as defined in the Agreement), "no less than the Minimum Offering shall have been subscribed for and accepted by the Company in accordance with the Offering Memorandum."

**Mercer's False Statements**

90.     The representations made by Dorman, Salino and Goldstein to Lee and other Dry Cleaning representatives described above, were false.

91.     Mercer, through Dorman, Salino and Goldstein, knew the representations were false when made or made them with reckless disregard for whether or not the representations were true or false.  In particular, upon information and belief, Mercer, through Dorman, Salino and Goldstein, knew, at the time it made the representations, that it could not perform under the Agreement because it had no credibility in the financial markets owing to its negative reputation for offering poor quality investments that often resulted in a substantial or total loss to investors.

92.    Upon information and belief, Mercer further knew that its statements to Lee about its success in raising the entire offering for Neostem were false.  In fact, on information and belief, Mercer raised less than half of the monies they had promised to raise in the Neostem offering and the principals of Neostem were forced to raise capital on their own.

93.    Upon information and belief, contrary to its representations to Dry Cleaning, Mercer knew that its institutional investment arm and retail brokers were not willing to commit to the Dry Cleaning offering.

94.    Upon information and belief, contrary to its representations to Dry Cleaning, Mercer had weak relationships with the brokerage syndicates.  In fact, Mercer did not secure any such syndicate to invest in the Dry Cleaning offering.

95.    When Mercer represented to Dry Cleaning that it would focus only on raising money for Dry Cleaning and not on other offerings, upon information and belief, Mercer knew that representation was false in that it never intended to work only on the Mercer offering.  On information and belief, Mercer had, in fact, then already agreed to work on other offerings.  In fact, on further information and belief, Mercer was then working on other offerings including those for Waste2Energy, Inc., Amber Alert Safety Centers, Inc., and Broadspot Worldwide Wireless, Inc.

**The Switch**

96.    Upon information and belief, Mercer prioritized each of the offerings for other companies before Dry Cleaning, such that Mercer brokers would not sell Dry Cleaning securities, until it had obtained an appropriate level of investment in the other offerings.

97.    Not surprisingly, given Mercer's true poor capabilities to raise capital, Mercer struggled to raise even the $2 million Minimum Offering amount.

98.     Owing to Mercer's inability to raise the Minimum Offering within the agreed time frame, Dry Cleaning agreed with Mercer to extend the Initial Closing Date in order to allow more time for Mercer to perform its obligations under the Agreement.

99.     Mercer failed to raise the minimum of $2 million by the Initial Closing Date as extended under the Agreement.

100.    Mercer never raised the minimum of $2 million as provided in the Agreement.

101.    Because of Mercer's failure to raise even the $2 million minimum amount, Dry Cleaning was forced to raise the money on its own, in order to close on the Offering.

102.    Dry Cleaning raised money by, among other things, securing commitments from brokerage syndicates such as Regal Securities and Wedbush Morgan Securities, none of which were identified or solicited by Mercer. In total, Dry Cleaning itself raised approximately $1.3 million from these syndicates alone.

103.    Dry Cleaning on its own raised an additional approximately $6 million, substantially through the efforts of Lee, including through his personal contacts. None of these sources were identified or solicited by Mercer.

104.    In order to raise funds on its own, Dry Cleaning incurred fees, charges, expenses and disbursements in the amount of approximately $500,000.

105.    As a direct and proximate result of Mercer's inability to raise the capital, Dry Cleaning was forced to close the Offering with a material shortfall in funds from the level that Mercer had promised to raise, which shortfall, and the market's knowledge of same, caused Dry Cleaning's market capitalization to drop approximately in half from approximately $40,000,000 to $20,000,000 during the extended offering period.

## FIRST COUNTERCLAIM
### (Declaratory Judgment)

106.    Dry Cleaning repeats and re-alleges each and every allegation contained in the above paragraphs as though fully set forth herein.

107.    Section 7(a) of the Agreement provides that Mercer's acting as placement agent is subject to the condition that "on the Initial Closing Date, no less than the Minimum Offering shall have been subscribed for and accepted by the Company in accordance with the Offering Memorandum."

108.    Mercer failed to obtain subscriptions for or otherwise raise the Minimum Offering by the Initial Closing Date.

109.    Since Mercer failed to raise the Minimum Offering by the Initial Closing Date, the Agreement is not binding.

110.    Mercer is not owed any money under the Agreement.

111.    By its complaint, Mercer seeks payment from Dry Cleaning claiming that it is owed in excess of $1,500,000 under the Agreement.

112.    A justiciable controversy exists between the parties concerning their respective rights and obligations under the Agreement.

113.    Dry Cleaning has no adequate remedy at law.

114.    Dry Cleaning is entitled to a judgment declaring that the Agreement is not binding on either party, and Dry Cleaning has no payment obligation to Mercer under the Agreement since Mercer failed to raise the Minimum Offering by the Initial Closing Date.

## SECOND COUNTERCLAIM
### (Breach Of Contract)

115.    Dry Cleaning repeats and re-alleges each and every allegation contained in the above paragraphs as though fully set forth herein.

116.    The Agreement obligates Mercer to use its reasonable efforts to raise a minimum of $2 million in the Offering.

117.    Mercer materially breached the Agreement by failing to use reasonable efforts to raise the minimum amount of $2 million.

118.    Examples of Mercer's failure to use reasonable efforts include, upon information and belief:

(a)    Having no commitment from its institutional investment group to raise $5 million;

(b)    Having no commitment from its retail brokers to raise $5 million;

(c)    Having insufficient connections with various brokerage syndicates to raise additional monies and failing to make use of any such syndicate;

(d)    Relying on its institutional investment group and retail brokers to raise funds in the Offering, even though such constituents were not committed to such Offering; and

(e)    Refusing to sell Dry Cleaning securities unless and until securities in the other firms it had contracted with to act as placement agent were sold first.

119.    Dry Cleaning has performed all conditions, covenants and other obligations required of it under the Agreement.

120.    As a direct and proximate result of Mercer's breach of the Agreement, Dry Cleaning has suffered damages in an amount to be determined at trial, but no less than $20 million.

## THIRD COUNTERCLAIM
### (Fraud - Damages)

121.    Dry Cleaning repeats and re-alleges each and every allegation contained in the above paragraphs as though fully set forth herein.

122. The representations described above in paragraphs 79 through 83 and 91 through 95, that Mercer made to Dry Cleaning to cause it to sign the Agreement were false.

123. Mercer knew the foregoing representations to Dry Cleaning were false when made or made them with reckless disregard for whether or not the representations were true or false.

124. Mercer made the foregoing representations with the intent to deceive Dry Cleaning, in order to induce Dry Cleaning to enter into the Agreement.

125. Dry Cleaning justifiably and reasonably relied on Mercer's representations based on, among other reasons, Mercer's status as a National Association of Securities Dealers (now FINRA) member firm and a member of the National Investment Banking Association.

126. The representations made by Mercer to Dry Cleaning were material to Dry Cleaning in that Dry Cleaning would not have entered into the Agreement with Mercer had it known these representations were false.

127. Dry Cleaning performed all conditions, covenants and obligations required of it under the Agreement.

128. As a direct and proximate cause of Mercer's misrepresentations, Dry Cleaning has suffered damages in an amount to be determined at trial, but no less than $20 million, which damages resulted from Dry Cleaning's drop in market capitalization, out of pocket costs incurred to raise funds through other sources, and other economic harm.

## FOURTH COUNTERCLAIM
### (Negligent Misrepresentation)

129. Dry Cleaning repeats and re-alleges each and every allegation contained in the above paragraphs as though fully set forth herein.

130.    Based on Mercer's solicitation of Dry Cleaning to act as its placement agent and its consequent obligations as agent under the Agreement, Mercer had a duty to disclose truthfully all material facts relating to the Agreement, including Mercer's true capability to raise the capital.

131.    Mercer breached that duty by negligently misrepresenting and failing to disclose the true status of its reputation in the financial markets and the true status of its ability to raise the capital.

132.    Mercer knew that Dry Cleaning would act in reliance upon its misrepresentations and omissions of material facts.

133.    At the time Mercer made the representations and omissions described above, Dry Cleaning was ignorant of the falsity of the representations and believed them to be true.

134.    In reliance on the representations made by Mercer, Dry Cleaning was induced to and did enter into the Agreement.

135.    Dry Cleaning reasonably and justifiably relied on Mercer's negligent misrepresentations, as Dry Cleaning had no reason to believe or suspect that Mercer, a NASD member firm, would misrepresent the facts.

136.    Had Dry Cleaning known the true facts, it would not have entered into the Agreement.

137.    As a direct and proximate result of Mercer's misrepresentations, Dry Cleaning has suffered damages in an amount to be determined at trial, but no less than $20 million.

### FIFTH COUNTERCLAIM
#### (Reformation of Contract)

138.    Dry Cleaning repeats and re-alleges each and every allegation contained in the above paragraphs as though fully set forth herein.

139.    Pursuant to the Agreement, the parties intended and agreed that Mercer would be paid ten percent (10 %) of the gross proceeds raised by Mercer through the offering.

140.    Because of a scrivener's error, Section 3(b) of the Agreement incorrectly provides that Mercer would be paid "ten percent (13%) of the gross proceeds raised by Mercer Capital."

141.    This clause of Section 3(b) is internally inconsistent and does not accurately express the agreement reached by the parties

142.    As alleged by Mercer in paragraphs 2 and 21 of the Complaint, pursuant to the Agreement, the parties agreed that Mercer would be paid a non-accountable expense allowance equal to two percent (2%) of the gross proceeds raised by Mercer.

143.    Because of a scrivener's error, Section 3(c) incorrectly provides that Mercer would be paid "a non-accountable expense allowance … equal to three (2%) of the gross proceeds raised by Mercer."

144.    This clause of Section 3(c) is internally inconsistent and does not accurately express the agreement reached by the parties.

145.    Dry Cleaning has no adequate remedy at law.

146.    The Agreement should be reformed and corrected to reflect the parties' true intent in the following respects: (i) Section 3(b) should be reformed and corrected to delete the reference to "13%", and (ii) Section 3(c) should be reformed and corrected to delete the reference to "three" percent.

## SIXTH COUNTERCLAIM
### (Unjust Enrichment)

147.    Dry Cleaning repeats and re-alleges each and every allegation contained in the above paragraphs as though fully set forth herein.

148.    Mercer's material breach of its own contractual obligations to raise the Minimum Offering forced Dry Cleaning to raise funds on its own.

149.    Notwithstanding Mercer's material breach and Dry Cleaning's own successful efforts to raise funds to reach and exceed the Minimum Offering amount, Mercer received from Dry Cleaning in excess of $600,000.00.

150.    Mercer has been unjustly enriched at the expense of Dry Cleaning in that it received funds from Mercer to which it is not entitled.

151.    Permitting Mercer to retain such funds would be inequitable.

152.    Dry Cleaning has no adequate remedy at law.

153.    Dry Cleaning is entitled to an order that Mercer holds such funds on account for Dry Cleaning and that they must be returned to Dry Cleaning.

## **PRAYER FOR RELIEF**

WHEREFORE Dry Cleaning prays for the following relief on its Counterclaims:

1.    On the First Counterclaim, a judgment declaring that a pre-condition to the mutual obligations of the parties under the Agreement requires Mercer to raise the Minimum Offering of $2 million by the Initial Closing Date; otherwise, the Agreement is not binding and that Mercer's failure to raise the Minimum Offering was a failure of that condition.

2.    On the Second Counterclaim, awarding Dry Cleaning a money judgment in an amount no less than $20 million.

3.    On the Third Counterclaim, awarding Dry Cleaning a money judgment in an amount no less than $20 million.

4.    On the Fourth Counterclaim, awarding Dry Cleaning a money judgment in an amount no less than $20 million.

5.     On the Fifth Counterclaim, reforming the Agreement (a) to correct Section 3(b) by deleting the reference to "13%" and (b) to correct Section 3(c) by deleting the reference to "three" percent.

6.     On the Sixth Counterclaim, an order directing Mercer to return the approximately $600,000 it received from Dry Cleaning and judgment against Mercer and in favor of Dry Cleaning in such amount.

7.     Interest, costs and attorneys' fees and such other and further relief as the Court deems to be just, equitable and proper.

Dated: New York, New York
       August 29, 2008

                              **GREENBERG TRAURIG, LLP**

                              By: _____
                                   James W. Perkins (JWP 6684)
                                   Rachel Sims (RS 6924)
                                   *Attorneys for Defendant*
                                   200 Park Avenue
                                   New York, New York 10166
                                   (212) 801-9200

TO:    TRUEHAFT & ZAKARIN, LLP
       *Attorneys for Plaintiff*
       347 5th Avenue, Suite #1000
       New York, New York 10016